# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NUTRITIONAL SOURCING | ) | Case Nos. 07-11038(PJW) |
| CORPORATION, et al., | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## MEMORANDUM OPINION

To:  Counsel listed in the attached on Exhibit A

Dated: December 23, 2008

**WALSH, J**

  This opinion is with respect to Debtors', Nutritional Sourcing Corporation ("NSC"), Pueblo International, LLC ("Pueblo") and FLBN, LLC ("FLBN"), Joint Chapter 11 Plan of Liquidation filed on September 4, 2008 (the "Plan"). (Doc. # 1528.) A number of parties have filed objections to the Plan, including objections to the confirmation of the Plan. See, e.g., Doc. # 1629. At the confirmation hearing on October 14, 2008, Debtors and the Official Committee of Unsecured Creditors (the "Committee" and together with Debtors, the "Plan Proponents") presented evidence in support of confirmation of the Plan. The objectors also presented evidence and cross examined the Plan Proponents' witnesses. (Doc. # 1675, 1678.) For the reasons stated below, the Court will deny confirmation of the Plan.

**BACKGROUND**

  NSC and its subsidiaries, Pueblo and FLBN, operated a chain of supermarkets in Puerto Rico and the U.S. Virgin Islands. Debtors also operated a chain of in-home movie and game entertainment outlets in Puerto Rico and the U.S. Virgin Islands through franchise rights with Blockbuster, Inc. (Doc. # 1499, p. 5.) On August 3, 2007, Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

This is not the first bankruptcy proceeding for NSC; it filed for chapter 11 bankruptcy in 2002 and emerged from chapter 11 on June 5, 2003.  (Case # 02-12550 (PJW).)  Pueblo and FLBN were not debtors in the 2002 bankruptcy case.  However, NSC's reorganization in that bankruptcy case impacted all Debtors and many of their creditors in the instant bankruptcy proceeding.  An integral part of NSC's 2003 reorganization was the issuance by NSC of Senior Secured Notes dated June 5, 2003.  These Senior Secured Notes were issued in exchange for certain other Senior Secured Notes due August 1, 2003 (the "Old Senior Notes").  (Doc. # 1499, pp. 7-8.)  According to the declaration of William T. Keon, III -- the CEO and President of each of the Debtors until his recent death -- which was filed in support of Debtors' request for approval of the Plan, the holders of the Old Senior Notes requested that the Senior Secured Notes be supported by guarantees secured by a pledge of all of NSC's subsidiaries.  NSC resisted this request and instead the Restated Subordinated Intercompany Real Estate Note dated June 5, 2003 was executed by Pueblo in favor of NSC (the "Mirror Loan Note").  (Doc. # 1676, ¶ 24-26.)  In brief, because NSC, as a holding company, does not have assets of its own to make payments on the Senior Secured Notes, the Mirror Loan Note provides for a transfer of funds from Pueblo to NSC and is secured by certain of Pueblo's real estate.  (Doc. # 1715, p. 12.)

As noted by Keon in his declaration, in order to assure Pueblo's trade creditors that they would be paid ahead of NSC's creditors, a subordination provision was added to the Mirror Loan Note. (Doc. # 1676, ¶ 27.) In particular, the Mirror Loan Note provides that payment is "subordinate to <u>all</u> claims of <u>any</u> trade creditors of [Pueblo]." (Doc. # 1676, ex. A, p. 2(emphasis added)). Thus, by its terms, the Mirror Loan Note cannot be paid until all claims of any trade creditor of Pueblo are paid in full.

The Mirror Loan Note does not include a definition of "trade creditor," nor does the Senior Note Indenture executed in connection with the Senior Secured Notes and the Mirror Loan Note. The instant objections to the Plan stem from this lack of definition of trade creditor in the Mirror Loan Note and its subsequent defining in the Plan. The Mirror Loan Note is governed by New York law. (<u>Id.</u> at ex. A, p. 8.)

NSC's public filings with the Securities and Exchange Commission ("SEC") demonstrate that the term "trade creditor" continued to remain undefined in relation to the Mirror Loan Note following the execution of the Mirror Loan Note. Specifically, (1) NSC's Annual Report (Form 10-K) for the year ended November 2, 2002, (2) NSC's Form 10-K for the year ended November 1, 2003, (3) NSC's Form 10-K for the year ended October 30, 2004, and (4) NCS's Form 10-K for the year ended October 29, 2005 include references to the Mirror Loan Note and/or discuss the subordination provision

therein.   Each of NCS's 10-Ks contain language similar to the following regarding the Mirror Loan Note: "The inter-company notes[, including the Mirror Loan Note,] are <u>subordinated to</u> the obligations of the subsidiaries under the May 2003 Bank Agreement and to the <u>trade creditors of Pueblo</u>."   Nutritional Sourcing Corporation, Annual Report (Form 10-K), at Part I, Item 7, "Liquidity and Capital Resources" (Dec. 23, 2004) (emphasis added). Also, NSC's Form 10-K notes that "as NSC is a holding company, indebtedness at the NSC level is effectively subordinated to indebtedness and other obligations at the operating subsidiary level." <u>Id.</u> at Part I, Item 1: "The Company is Highly Leveraged."

Despite the lack of definition of the term "trade creditor" in the Mirror Loan Note, in his declaration, Keon explained that:

> While defining the <u>term "trade creditor"</u> was <u>not specifically discussed at the time</u> of the issuance of the Senior Secured Notes, <u>the primary concern was to ensure that providers of grocery and other merchandise for resale to Pueblo</u>, including any related shipping costs, would be paid ahead of the claims of NSC's creditors.   Without trade credit from providers of grocery and other merchandise for resale, Pueblo would have encountered significant operating difficulties.   These providers were very concerned about how Pueblo was to operate and meet its obligations to them once NSC emerged from its prior chapter 11 case in 2003.

(Doc. # 1676, ¶ 28 (emphasis added)).   In his testimony on October 14, 2008, Keon added that Debtors did not have as urgent  concerns

about "non-trade creditors" -- creditors who did not provide grocery and other merchandise for resale to Pueblo -- as the goods and services those creditors provided were not perceived to be as important to Debtors' continued business operations.  (Doc. # 1700, 103:5-21; see also Doc. # 1715, p. 16.)

In addition to the Senior Secured Notes and the Mirror Loan Note, Debtors' prepetition capital structure included an Amended and Restated Loan and Security Agreement dated as of January 28, 2005 between NSC as guarantor, and Pueblo and FLBN as borrowers, with Westernbank Puerto Rico (the "Loan and Security Agreement"); it is secured by first priority liens on substantially all of Debtors' assets.  (Doc. # 1499, p. 6.)  Debtors' obligations as of the current bankruptcy filing's petition date were approximately $95 million under the Loan and Security Agreement, approximately $37 million under the Senior Secured Notes, and approximately $37 million under the Mirror Loan Note.  (Id. at pp. 7-8.)  The Loan and Security Agreement $95 million obligation was paid in full following Debtors' sale of substantially all of their going concern assets.

Shortly after filing their bankruptcy petition, on October 5, 2007, Debtors filed their schedules of assets and liabilities.  On Pueblo's Schedule F, Debtors listed all of Pueblo's general unsecured nonpriority claims, specifically identifying Pueblo's "trade creditors" on Pueblo's Schedule F-5.

(Doc. # 537, ex. F-5.)   The Schedules did not specify what was necessary to be included as a "trade creditor."   Several of the parties that have filed objections to the Plan are listed among Pueblo's creditors holding "trade" claims.   Pueblo's Schedule F-5 has not been materially amended or modified since it was sworn to on October 4, 2007.[1]

On July 31, 2008, the Plan Proponents filed the Plan, which was amended on September 2, 2008.   At issue here, the Plan divides Pueblo's general unsecured creditors into two sub-classes: Class 4A: Pueblo Trade Claims ("Pueblo Trade Claims") and Class 4B: Pueblo General Unsecured Claims ("Pueblo General Unsecured Claims").   The Plan defines "Pueblo Trade Claim" as:

> [T]he Allowed Claims of trade creditors who provided (i) grocery and other merchandise to Pueblo for ultimate sale by Pueblo or (ii) services that were directly related to or incorporated into grocery and other merchandise for ultimate sale by Pueblo (including services for the shipment and delivery of such goods to Pueblo) (in other words, a trade creditor must have had direct physical contact with the merchandise), consisting of (a) those claims listed on Schedules F-2, F-3, F-4, and F-5 of Pueblo's Trade Schedules (except with respect to those Claims listed on Exhibit B hereto), (b) the FLBN Allowed Trade Claim, or (c) any other Allowed Claim otherwise designated by the Debtors with the consent of the Committee or Steering Committee (which consent will not be

---

[1] On November 16, 2007, Debtors amended the summary page of Pueblo's Schedule F.   That amendment did not remove any "trade creditors" from the schedule, nor did it further specify what was necessary to be included as a "trade creditor."   (Doc. # 623.)

> unreasonably withheld or delayed) as a Pueblo
> Trade Claim.

(Doc. # 1499, app. A, § I.B.1.132.)    The Plan's Disclosure

Statement provides several illustrative examples of "non-trade

creditors": "providers of utility services, equipment suppliers,

non-merchandise related suppliers and service providers . . . ."

(Id. p. 26.)

Addressing the definition of Pueblo Trade Claim, in his

declaration, Keon stated:

> The definition of "Pueblo Trade Claim", as
> employed in the Plan, was the product of
> negotiations by and among the Committee, which
> included the Indenture Trustee, two holders of
> Senior Secured Notes (NSC Class 2B Claim
> Holders), three trade creditors (Pueblo Class
> 4A and FLBN 4C Claim Holders), the PBGC (the
> largest non-insider Pueblo Class 4B and FLBN
> Class 4C Claim Holder), the largest holder of
> the Senior Secured Notes and the Debtors,
> which negotiations sought to incorporate the
> Debtors' understanding of such term at the
> time the Mirror Loan Note was executed.

(Doc. # 1676, ¶ 29 (emphasis added).)    During his testimony, Keon

further explained that he viewed this definition as consistent with

the meaning commonly ascribed to the term "trade creditor" in the

grocery industry.    According to Debtors, "Keon testified that the

term trade creditor is understood in the grocery industry to mean

providers of grocery products and other merchandise for resale and

providers of services related to those products that have direct

contact with the products or merchandise for resale."    (Doc. #

1715, p. 18 (citing Doc. # 1676, ¶¶ 27-28; Doc. # 1700, 43:17-19,
44:16-20, 48:18-25, 72:14-15).)

Thus, the definition of Pueblo Trade Claim, and
concomitantly the definition of trade creditor, was formally
explicated years after the Mirror Loan Note was executed.  Of note,
the Committee that Keon stated negotiated the definition of Pueblo
Trade Claim consisted of: (1) the Indenture Trustee for the Senior
Secured Notes; (2) two holders of Senior Secured Notes; (3) the
Pension Benefit Guarantee Corporation ("PBGC"); and (4) three trade
creditors, each of whom fall within the definition of Pueblo Trade
Claim.  Thus, no "non-goods" trade creditors were on the Committee
and there is no evidence that any of those trade creditors were
involved in negotiations that produced the definition.

Recognizing the importance of the composition of the
Committee, on August 15, 2007, Badillo Nazca S&S, Inc. ("Nazca
S&S"), which provided advertising services to Pueblo, sent a letter
to the United States Trustee for the District of Delaware
requesting that the Committee be enlarged to include Nazca S&S.  Of
relevance, Nazca S&S noted that "[t]here is no trade creditor on
the Committee who is not a supplier of goods, and thus the class of
'nongoods' trade creditor is wholly unrepresented. . . . 'Nongoods'
creditor like Nazca S&S . . . deserve a voice." (Doc. # 1700, ex.
Badillo-1, pp. 1-2.)  Nazca S&S is Pueblo's third largest unsecured

trade creditor.  Despite this request, a "non-goods" trade creditor representative was not added to the Committee.[2]

Whether or not the claims of a certain creditor of Pueblo fit within the definition of Pueblo Trade Claim is crucial to that creditor's recovery on its claims.  According to the Disclosure Statement, Pueblo Trade Claims, totaling approximately $27,100,000, will be paid 100% on their claims, while Pueblo General Unsecured Claims, totaling approximately $79,220,000, will receive an estimated recovery of 13.2% on their claims.  (Doc. # 1715, viii-ix.)

The relevant instant objections to the Plan come from creditors who provided goods and services to Pueblo and who have been defined out of Pueblo Trade Claims.  These creditors argue either that Plan incorrectly classifies their claims as Pueblo General Unsecured Claims and that their claims should be reclassified as Pueblo Trade Claims, or that the Plan unfairly discriminates against certain unsecured creditors and thus should

---

[2]Nazca S&S's request to be on the Committee was not prompted by the Pueblo Trade Claim definition dispute here.  That term did not surface until the Plan was filed in July 2008.  Rather, according to Nazca S&S, it was complaining to the U.S. Trustee that "[t]here is no trade creditor on the Committee who is not a supplier of goods, and thus the class of 'nongoods' trade creditor is wholly unrepresented. This is particularly significant because all three 'goods' trade creditors almost certainly have administrative claims under new section 503(b)(9), and most likely also have reclamation claims under enhanced section 547(c)." (Doc. # 1700, Badillo ex. 1, p. 2.)

not be confirmed by the Court.[3]  In support of their objection to confirmation of the Plan, these creditors argue that: (1) the Plan improperly classifies certain claims in violation of 11 U.S.C. §§ 1122 and 1123(a)(4), which require equal treatment for substantially similar claims, and thus, does not comply with the provisions of 11 U.S.C. § 1129; and (2) the Plan violates the Mirror Loan Note subordination scheme.  See Doc. # 1626 and 1629.

In response, the Plan Proponents argue that the definition of Pueblo Trade Claim is a reasonable compromise that was the product of a good faith negotiation, that is consistent with meaning commonly ascribed to the term "trade creditor," and that comports with the intent of relevant parties at the execution of the Mirror Loan Note.  They also note that the definition is an integral "part of an integrated and complex series of settlements that do not unfairly discriminate and will inure to the benefit of

---

[3]Specifically, the following creditors of Pueblo object to the classification of their claims as Pueblo General Unsecured Claims rather than Pueblo Trade Claims and to confirmation of the Plan: (1) Badillo Nazca S&S, Inc., which provided advertising services to Pueblo (Doc. # 1626, 1635); (2) Liquidity Solutions, Inc., which provided refrigeration equipment and parts to Pueblo (Doc. # 1628); (3) ASM Capital LP and ASM Capital III LP, which purchased one hundred and sixty-seven individual general unsecured trade claims scheduled by Pueblo (Doc. # 1629); (4) El Dia, Inc. and El Nuevo Dia, Inc. ("El Dia"), which provided newspapers for resale and advertising services to Pueblo (Doc. # 1636); (5) Puerto Rico Electric Power Authority (Doc. # 1643); (6) Rio Grande Investment, LLC and Plaza San Francisco Investment, LLC (Doc. # 1645); and (7) the informal objection of National Compressor Exchange of NY, Inc. (see Doc. # 1675, n. 2). Also, on November 18, 2008, pursuant to Fed. R. Bankr. P. 9006(b)(2), the Court granted Empresas De Gas Co., Inc.'s ("Empresas") motion to join in the objections filed to confirmation of the Plan.  (Doc. # 1733.)  Empresas provided Pueblo with liquid petroleum gas.  (Id. at ex. B, p. 3.)

all creditors."[4]  (Doc. # 1715, pp. 3-4.)  As such, they argue that the Court should approve the settlement according to the requirements of Fed. R. Bankr. P. 9019 (providing, in pertinent part, that "after notice and a hearing, the court may approve a compromise or settlement").

          The Plan does not provide for substantive consolidation. Rather, there are three separate Plans and six separate classes of claims that will receive distributions.  Indeed, the Plan and accompanying Disclosure Statement are very complex and quite lengthy.  Specifically, under the three Plans, in addition to the recovery percentages noted above for Pueblo Trade Claims and Pueblo General Unsecured Claims, Class 1A: Pueblo Other Priority Claims will be paid 100% on their claims, Class 2A: NSC Mirror Loan Note Claims will be paid 100% on its claim, Class 2B: Senior Secured Note Claims will be paid approximately 36.2% on their claims, and Class 4C: FLBN General Unsecured Claims will be paid approximately 25.1% on their claims.  (Doc. # 1499, pp. iii-xii.)  Based on the relative priority in payment of these classes, if claims of certain creditors of Pueblo are reclassified from Pueblo General Unsecured Claims to Pueblo Trade Claims, the recovery amounts for Classes 2B, 4A, and 4C, and Pueblo General Unsecured Creditors all most likely

_____

          [4]Specifically, Keon testified that "[t]he Plan includes the settlement of many other complex issues, including: (i) the amount and validity of decades worth of intercompany claims; (ii) amount, validity and priority of claims of the PBGC; (iii) amount, validity and classification of certain insider claims."  (Doc. # 1715, p. 6 (citing Doc. # 1700, 109:21-25, 110:1-2, 111:13-16, 112:22-24).)

will be impacted. (Doc. # 1715, p. 9 and appendixes.) Debtors estimate that they will have approximately $60,800,000 to distribute to creditors. (Id. at p. 8.) Thus, it is clear that various classes of creditors have a keen interest in how the terms "trade creditor" and "Pueblo Trade Claim" are defined.

**DISCUSSION**

Standard for Confirmation

For the court to confirm a plan, the plan proponents must establish by a preponderance of the evidence that the plan satisfies each of the requirements of 11 U.S.C. § 1129(a). See In re New Century TRS Holdings, Inc., 390 B.R. 140, 158 (Bankr. D. Del. 2008); In re Armstrong World Indus., 348 B.R. 111, 120 (D. Del. 2006). As confirmed by legislative history, 11 U.S.C. § 1129(a)(1), which provides that the plan must "compl[y] with the applicable provisions of this title," requires that a plan comply with 11 U.S.C. §§ 1122 and 1123: "Paragraph (1) [of § 1129(a)] requires that the plan comply with the applicable provisions of Chapter 11, such as Section 1122 and 1123, governing classification and contents of plan." In re S & W Enterprise, 37 B.R. 153, 158 n.15 (Bankr. N.D. Ill. 1984) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977), S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978)). Also, because an impaired class (Class 4A: Pueblo Trade Claims) did not accept the plan, the plan proponents must demonstrate that the plan "does not discriminate" and is "fair and

equitable" to the non-accepting impaired class pursuant to 11
U.S.C. § 1129(b).[5] See In re New Century TRS Holdings, 390 B.R. at
158 ("Because an impaired class did not vote to accept the plan,
the plan proponents must also show that the plan . . . does not
unfairly discriminate against dissenting classes and the treatment
of the dissenting classes is fair and equitable."); In re Zenith
Elecs. Corp., 241 B.R. 92, 105 (Bankr. D. Del. 1999) ("Where a
class of creditors or shareholders has not accepted a plan of
reorganization, the court shall nonetheless confirm the plan if it
does not discriminate unfairly and is fair and equitable." (quoting
11 U.S.C. § 1129(b)) (internal quotations omitted)).

     As noted, the objecting parties argue that the Plan
should not be confirmed because its classification scheme violates
§§ 1122, 1123(a)(4), and 1129(b).[6] See, e.g., Doc. # 1629, pp. 5-
9. The objecting parties' arguments hinge on the Plan's definition

---

[5]In pertinent part, 11 U.S.C. § 1129(b) reads: "(1) . . . if all
of the applicable requirements of subsection (a) of this section other
than paragraph (8) [providing that each impaired class must accept the
plan] are met with respect to a plan, the court, on request of the
proponent of the plan, shall confirm the plan notwithstanding the
requirements of such paragraph if the plan does not discriminate
unfairly, and is fair and equitable, with respect to each class of
claims or interests that is impaired under, and has not accepted, the
plan."

[6]In pertinent part, 11 U.S.C. § 1122(a) reads: "[A] plan may
place a claim or an interest in a particular class only if such claim
or interest is substantially similar to the other claims or interests
of such class." 11 U.S.C. § 1123(a)(4) reads: "[A] plan shall . . .
provide the same treatment for each claim or interest of a particular
class, unless the holder of a particular claim or interest agrees to a
less favorable treatment of such particular claim or interest."

of Pueblo Trade Claim, in effect arguing that the definition re-defines the term "trade creditor" as included in the Mirror Loan Note, the Debtor's SEC filings, and Pueblo's Schedule F-5. Conversely, in furtherance of their position that the Plan meets the requirement for confirmation, the Plan Proponents argue that the definition of Pueblo Trade Claim is a reasonable compromise and an integral part of a "multi-faceted settlement" which the Court should approve because that settlement meets the requirements of Fed. R. Bankr. P. 9019 and comports with the meaning the contracting parties ascribed to the term "trade creditor" at the time the Mirror Loan Note was executed. (Doc. # 1715, pp. 21-23.)

<u>Definition of Trade Creditor</u>

Central to the Plan Proponent's position that the definition of Pueblo Trade Claim is a reasonable compromise that should be approved by the Court is that the outcome of that negotiation defines "trade creditor" in a way that is in accord with the meaning commonly ascribed to "trade creditor" in the grocery industry. Specifically, as quoted above, Debtors assert that: "Mr. Keon testified that the term trade creditor is understood in the grocery industry to mean providers of grocery products and services related to those products that have direct contact with the products or merchandise for resale." (<u>Id.</u> at p. 18 (citing Doc. # 1676, ¶¶ 27-28; Doc. # 1700, 43:17-19, 44:16-20, 48:18-25, 72:14-15).) The Plan Proponents argue that it was this

definition of "trade creditor," influenced by trade usage, that was

the meaning ascribed to the term "trade creditor" by the parties

executing the Mirror Loan Note.

Under New York law, which governs the Mirror Loan Note,

where contract language is unambiguous, it must be given its

commonplace meaning:

> As a general matter, the objective of contract
> interpretation is to give effect to the
> expressed intentions of the parties. . . .
> Contract language is not ambiguous if it has
> "a definite and precise meaning, unattended by
> danger of misconception in the purport of the
> [contract] itself, and concerning which there
> is no reasonable basis for a difference of
> opinion."  Language whose meaning is otherwise
> plain does not become ambiguous merely because
> the parties urge different interpretations in
> the litigation.

Hunt, Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277

(2d Cir. 1989) (quoting Breed v. Insurance Company of North

America, 385 N.E.2d 1280, 1283 (1978)) (internal citations

omitted). See also In re Estates of Covert, 761 N.E.2d 571, 576-77

(N.Y. 2001) ("[C]ontracts of insurance, like other contracts, are

to be construed according to the sense and meaning of the terms

which the parties have used, and if they are clear and unambiguous

the terms are to be taken and understood in their plain, ordinary

and proper sense.") (quoting Hartol Prods. Corp. v Prudential Ins.

Co. of Am., 47 N.E.2d 687, 689 (N.Y. 1943)); Meccico v. Meccico,

559 N.E.2d 668, 669 (N.Y. 1990) ("Where the contract is clear and

unambiguous on its face, the courts must determine the intent of

the parties from within the four corners of the instrument.").
Phrased differently, courts look to whether a contract has "more
than one meaning when viewed objectively by a reasonably
intelligent person who has examined the context of the entire
integrated agreement and who is cognizant of the customs,
practices, usages and terminology as generally understood in the
particular trade or business." E.R. Squibb & Sons, Inc. v. Lloyd's
& Cos., 241 F.3d 154, 174 (2d Cir. 2001) (quoting Lightfoot v.
Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997)).  If a
certain term in a contract is unambiguous, "the obligations it
imposes are to be determined without reference to extrinsic
evidence." Hunt, 889 F.2d at 1277.

The objecting parties -- specifically ASM Capital LP and
ASM Capital III LP ("ASM") -- contend that trade usage cannot be
used to interpret an unambiguous term.  Doc. # 1727, pp. 12-13. I
disagree.  Trade usage may be considered by the Court even if a
contract term is unambiguous.  See Chase Manhattan Bank v. First
Marion Bank, 437 F.2d 1040, 1046 (5th Cir. 1971) (examining standby
and subordination agreements under New York law and noting that
"[c]ertainly the parol evidence rule does not preclude evidence of
course of dealing or usage of trade, for such evidence merely
delineates a commercial backdrop for intelligent interpretation of
the agreement" and that "unless a judge considers a contract in the
proper commercial setting, [her or] his view is apt to be distorted

or myopic, increasing the probability of error"); 12 Richard A. Lord, <u>Williston on Contracts</u> § 34:5 (4th ed. 2003) ("[E]vidence of usage may be admissible to give meaning to apparently unambiguous terms of a contract where other parol evidence would be inadmissible.  Thus, circumstances known to the parties at the time they entered into contract, such as what that industry considered to be the norm . . . should be considered in construing a contract . . . ."). Likewise, <u>Chase Manhattan Bank v. May</u>, 311 F.2d 117, 119 (3d Cir. 1962), in interpreting New York case law, states that "usage and custom cannot be proved . . . to alter or contradict the express or implied terms of a contract free from ambiguity . . . ." However, that case does not say that a court cannot consider trade usage in order to explain the context of an entire integrated agreement.

In order for this Court to decide that the trade usage the Plan Proponents proffer was incorporated into the Mirror Loan Note, the Plan Proponents "must  show either that the other party to the contract is actually aware of the usage, or that the existence of the usage in the business to which the transaction relates is so notorious that a person of ordinary prudence in the exercise of reasonable care would be aware of it." <u>Reuters Ltd. v. Dow Jones Telerate, Inc.</u>, 231 A.D.2d 337, 343 (N.Y. App. Div. 1997).

ASM also contends that expert testimony is necessary to establish a specific trade usage meaning, citing <u>Matrix Int'l Textiles, Inc. v. Jolie Intimates, Inc.</u>, 2005 N.Y. Misc. LEXIS 888 (N.Y. Civ. Ct. May 5, 2005), for the proposition that "[e]xpert testimony is <u>usually</u> required to prove trade usage. . . . A party and its employees may certainly be qualified to give expert testimony, and each of the witnesses here appears to have spent some time in the textile or apparel industries, but none was offered or qualified as an expert." <u>Id.</u> at *25 (internal citation omitted) (emphasis added). However, in saying that expert testimony "usually" is required, the case conforms to the use made by other courts of testimony regarding trade usage presented by industry participants. <u>See, e.g.</u>, <u>Central & South American Import Co. v. Prudential Lines</u>, 1980 U.S. Dist. LEXIS 13297, at *8-9 (S.D.N.Y. 1980) (relying on testimony of executive vice president and general manager to determine trade usage in the banana shipping industry).

Expert testimony is not absolutely required to establish a specific trade meaning usage. Rather, the testimony of industry participants like Keon, regardless of whether they are deemed experts, must be examined in light of their experience in the industry and whether their testimony demonstrates that the contracting parties or a "person of ordinary prudence in the exercise of reasonable care" understood that a specific term as

used in a contract was meant to assume its trade usage as to the contract.  <u>Reuters</u>, 231 A.D.2d at 343.  Whether or not Keon's testimony proves that the proffered grocery industry meaning of the term "trade creditor" is indeed a trade usage and was the meaning ascribed to the term "trade creditor" by the parties executing the Mirror Loan Note is the appropriate analysis.

The Mirror Loan Note provides that it is "subordinate to <u>all</u> claims of <u>any</u> trade creditors of [Pueblo]."  (Doc. # 1676, ex. A, p. 2 (emphasis added)).  "Trade creditors" are not defined most likely because the term "trade creditor" has a commonplace, unambiguous meaning, in New York case law and elsewhere.  It is clear that New York case law defines a "trade creditor" as someone who provides a good or service in the ordinary course of business and to whom debt is owed.  For example, in the context of discussing what parties may be hurt by a Ponzi scheme, the Bankruptcy Court for the Western District of New York stated "in this case, goods and services provided by trade creditors, such as telephone service, office space, and power to run computers, allowed Unified Commercial to appear to be a legitimate business . . . ."  <u>In re Unified Comm. Capital, Inc.</u>, 260 B.R. 343, 352 (Bankr. W.D.N.Y. 2001).  This statement comports with references to "trade claim" and "trade creditor" in other New York cases.  Again in the context of a Ponzi scheme, in <u>In re Bennett Funding Group, Inc.</u>, 253 B.R. 316 (Bankr. N.D.N.Y. 2000), the Bankruptcy Court for

the Northern District of New York noted that "trade creditors" would be impacted by the outcome of the court's decision. As the trustee identified certain defendants as "trade creditors" seemingly without an accompanying definition, in a footnote, the court explained that "'[t]rade' is defined as the 'business of buying and selling or bartering goods or services.'  It follows that a 'trade creditor' is someone to whom debt is owed in connection with such a business transaction." Id. at 321 n. 6 (quoting Black's Law Dictionary 1500 (7th ed. 1999)). See also In re Indesco Int'l, Inc., 354 B.R. 660, 665-67 (Bankr. S.D.N.Y. 2006) (noting that the proposed plan defined "trade claim" as "the claims of general unsecured creditors that arose prior to the Petition Date on account of the furnishing of goods or services to such Debtor by the respective Holders of such Claims" and confirming that "trade claims" arose through the provision of "goods and services"); In re Kalvar Microfilm, Inc., 204 B.R. 434, 438 (Bankr. D. Del. 1997) (noting that the proposed plan defined "trade claim" as "[a]ny unsecured Claim arising from or with respect to (i) the sale and delivery of goods or the rendition of services to Debtors prior to the Petition Date and (ii) all other obligations incurred in the ordinary course of business by Debtors in the conduct and operation of their business prior to the Petition Date").

     The definition of "trade creditor" is so commonplace that other courts define "trade creditor" similarly. For instance, the

Tenth Circuit has defined "trade creditors" as "those to whom a debt is owed for the provision of goods (or perhaps goods or services) used in the conduct of one's business." United States v. Brown, 348 F.3d 1200, 1213-14 (10th Cir. 2003) (citing The Dictionary of Modern Economics (1981) and The Wall Street Dictionary (1990)). See also In re Rocky Mt. Refractories, 208 B.R. 709, 718 (B.A.P. 10th Cir. 1997) ("I find nothing in . . . the Code saying that trade creditors, suppliers, landlords, lawyers, and other who supply goods and services to Chapter 11 debtors are entitled to interest on their administrative claims."); In re Stratford of Texas, Inc., 635 F.2d 365, 367 (5th Cir. 1981) ("[T]heir indebtedness was to trade creditors, i. e., suppliers of goods and services for these operations."). Accordingly, the term "trade creditor" has a commonplace, unambiguous meaning. Unless the Mirror Loan Note was supplemented by a trade usage definition of the term "trade creditor" as understood by the contracting parties, I believe that the Mirror Loan Note is unambiguous and "trade creditor" delineates the commonplace meaning of that term: someone who provides a good or service in the ordinary course of business and to whom debt is owed.

In relevant part, the Pueblo Trade Claim is defined as "the Allowed Claims of trade creditors who provided . . . grocery and other merchandise to Pueblo for ultimate sale by Pueblo . . . ." (Doc. # 1499, app. A, § I.B.1.132.)  It is clear from this

definition that Pueblo Trade Claims are a subset of "trade creditors."   Research has not revealed any reported case that defines "trade creditor" in the manner that the Pueblo Trade Claim is defined.

Despite their arguments to the contrary, I think it is clear that Debtors adopted this commonplace meaning of "trade creditor" as well up until their proposal of the Plan, including when executing the Mirror Loan Note.   In his declaration, Keon stated that in determining the term "trade creditor" at the time of the issuance of the Mirror Loan Note, the "primary concern was to insure that the providers of grocery and other merchandise for resale to Pueblo . . . would be paid ahead of the claims of NSC's creditors."  (Doc. # 1676, ¶ 28.)  He did not say that it was the sole concern or sole purpose for the term.   That the providers of grocery and other merchandise for resale would be the primary concern is understandable: Pueblo was operating grocery stores and presumably that group of trade creditors is much larger than the group of "non-goods" trade creditors.   However, this does not mean that the term "trade creditor" was included in the Mirror Loan Note with the assumption that only "providers of grocery products and other merchandise for resale and providers of services related to those products that have direct contact with the products or merchandise for resale" were covered.   (Doc. # 1715, p. 18.)

Also, though Keon testified -- as paraphrased by Debtors
-- that "the term trade creditor is understood in the grocery
industry to mean providers of grocery products and other
merchandise for resale and providers of services related to those
products that have direct contact with the products or merchandise
for resale," Keon's testimony on cross-examination undermines this
statement and the Plan Proponent's position.  (Doc. # 1715, p. 18.)
During cross-examination, Keon was asked:

> Q    Do you mean to testify that the only
>      creditors who needed comfort were the
>      trade creditors who put the food on the
>      shelves?  Is that your testimony?
>
> A    That was your -- the answer to that
>      question is no.

(Doc. # 1700, 38:11-14.)  Similarly, also during cross-examination,

Keon was asked:

> Q    Is it fair to say that all creditors, all
>      entities that provided goods or services,
>      not just those who provided food and put
>      food on the shelves would have been
>      concerned about Pueblo's ability to repay
>      them?
>
> A    I think they would.

(Id. at 39:21-25.)  Moreover, with respect to non-goods trade
creditors, on cross-examination Keon identified various items and
services the absence of which would produce operating difficulties
for supermarkets: grocery bags (id. at 64), HVAC services (id.),
security services (id. at 65-66), refrigeration services (id. at
66), and refrigeration containers (id. at 68).  Rather than

supporting the Plan Proponent's position, this list and Keon's cross-examination testimony is more consistent with the contention of the objecting creditors that the term "trade creditor," as used in the Mirror Loan Note, was designed to cover all providers of goods and services.   Indeed, Keon's specific representation that the term "Pueblo Trade Claim," which closely relates to the definition of trade creditor, was a product of negotiations seriously undermines his testimony that his proffered trade usage of "trade creditor" is widely accepted in the grocery industry: if the trade usage of "trade creditor" was widely understood, the long and convoluted definition of Pueblo Trade Claim would have been unnecessary.

Furthermore, I think actions of Debtors leading up to the proposal of the Plan confirm that the term "trade creditor," as used in the Mirror Loan Note, most likely took its commonplace meaning.[7]   First, NSC's SEC filings -- which presumably were written for the benefit of explicating Debtors' financial structure and situation to the public -- do not provide any explanation about how trade creditors are defined in the grocery industry.  As noted, each of NSC's 10-Ks contains language similar to the following regarding the Mirror Loan Note: "The inter-company notes[, including the Mirror Loan Note,] are <u>subordinated to</u> the

---

[7]Having found that trade usage may be considered by the Court even if a contract term is unambiguous, the use of the extrinsic evidence I discuss below in relation to trade usage is appropriate.

obligations of the subsidiaries under the May 2003 Bank Agreement
and to the <u>trade creditors of Pueblo</u>."   Nutritional Sourcing
Corporation, Annual Report (Form 10-K), at Part I, Item 7:
"Liquidity and Capital Resources" (Dec. 23, 2004) (emphasis added).
Also, NSC's 10-K notes that, "as NSC is a holding company,
indebtedness at the NSC level is effectively subordinated to
indebtedness and other obligations at the operating subsidiary
level." <u>Id.</u> at Part I, Item 1: "The Company is Highly Leveraged."
Without further information about the definition of trade creditor,
these two statements combined clearly suggest to anyone accessing
the public filings that all trade creditors of Pueblo, as commonly
defined, enjoy a higher claim on Pueblo's assets than any inter-
company note.

        SEC disclosure documents are required to be written in
plain English to assist the public's interpretation of those
documents.  Plain English Disclosure, 63 Fed. Reg. 6370 (Oct. 1,
1998).  Though the language in NSC's SEC filings does not prove
what the contracting parties took the term "trade creditor" to mean
when they executed the Mirror Loan Note, if the term was meant to
assume its grocery industry meaning, under the plain English rule,
NSC should have indicated the distinction in its SEC filings.  It
is logical to assume that not all potential investors in NSC were
versed in the grocery industry; as such, NSC had the burden to take
that into account in drafting their SEC filings.  That NSC did not

provide an explanation of the term "trade creditor" makes me seriously question whether that term really was meant to cover only providers of grocery and other merchandise for resale as Keon contends.

Second, as counsel for ASM pointed out in his cross-examination of Keon, when Debtors filed their schedules in October 2007, as to Pueblo's Schedule F-5, they made no distinction between goods trade creditors and non-goods trade creditors. An examination of Pueblo's Schedule F-5 reveals that, based upon the names of the various vendors, there are numerous non-goods trade creditors on that list. Though goods and services providers to Pueblo possibly should be charged with more insight into the industry definition of trade creditor than the general investing public, I think combining both goods and non-goods trade creditors on a detailed schedule that inferentially references the Mirror Loan Note further indicates that the term "trade creditor," as used in the Mirror Loan Note, was not meant to cover only providers of grocery and other merchandise for resale to Pueblo.[8]

_____

[8]Debtors assert that Pueblo's Schedule F-5 "ha[s] no relationship to the Mirror Loan Note and the Debtors used the same distinction in the FLBN schedules, notwithstanding the fact that the Mirror Loan Note (and its related subordination provision) has no applicability to FLBN." (Doc. # 1715, p. 20, n. 23.) Though the fact that Pueblo's Schedule F-5 utilizes the term "trade creditor" is not dispositive as to its use in the Mirror Loan Note, I think that such a detailed list of creditors does bear on how both Debtors and their creditors interpreted the term "trade creditor." That the FLBN schedules distinguished creditors similarly further demonstrates that Debtors allowed the term "trade creditor" to assume its commonplace meaning in most instances.

Third, ASM also points to the definition of "Trade Payables" in the Senior Note Indenture that was negotiated at the same time as the Mirror Loan Note, arguing that the term "trade creditor," as used in the Mirror Loan Note, assumed its commonplace meaning. Specifically, "Trade Payables" are defined as "with respect to any Person, any accounts payable or any other indebtedness or monetary obligation to <u>trade creditors</u> created, assumed or Guaranteed by such Person or any of its Subsidiaries arising in the ordinary course of business in connection with the acquisition of goods or services." Doc. # 1675, p. 22, n. 17 (emphasis added). ASM contends that the definition of trade creditor is clear because "the Senior Note Indenture, which was <u>negotiated by the same parties as the Mirror Loan Note</u>, uses and defines the word 'trade creditor' in its normal, unambiguous meaning." (Doc. # 1727, p. 12 (emphasis in original).)

I do not agree that the definition of Trade Payables defines the term "trade creditor" in the Mirror Loan Note, but I do think that the definition of Trade Payables further speaks to Debtors' continual use of the commonplace meaning of "trade creditor." The definition of Trade Payables identifies "trade creditors" as one group of creditors while constraining who among those groups of creditors hold "trade payables." By constraining "trade creditors" to those trade creditors whose claims arose in the ordinary course of business in connection with the acquisition

of goods and services, necessarily the group "trade creditors" encompasses a wider cross-section of creditors.  Under the Plan Proponents arguments, Debtors used the term "trade creditor" in two places in two related documents while attaching two different meanings to that term.  It would have been logical for Debtors at some point before proposal of the Plan to indicate that those two related documents defined "trade creditor" differently.  That they did not, indicates to me that the term "trade creditor," as used in the Mirror Loan Note, most likely took its commonplace meaning.[9]

Similarly pertaining to definitions, in arguing that both Pueblo's goods and non-goods suppliers understood and operated based on the grocery industry definition of "trade creditor," the Committee references the testimony of Badillo's employee Raquel Rivera.  During her direct examination, Rivera stated that in preparing advertisements for special promotions "depending on the negotiations you have with the trade you drop in whatever prods [sic] you have at special prices." (Doc. # 1700, 81:2-5.)  Then on cross-examination, when asked what she meant by "trade," Rivera responded, "[t]he suppliers, the vendors." Id. at 91:16.  The

---

[9]Nazca S&S and El Dia claim that Debtors' use of the term "trade" in the List of Creditors Holding 20 Largest Unsecured Claims ("Top 20") supports the objecting parties' argument that "trade creditor" assumed its common meaning in the Mirror Loan Note.  (Doc. # 1731, pp. 3-4; Doc. # 1726, pp. 7-8.)  However, as Debtors point out, the bankruptcy form that instructs debtors how to create their lists of creditors includes "trade debt" as a category of claims.  Thus, I do not believe the use of the term "trade" in Debtors' Top 20 is very informative as to Debtors' use of the term "trade creditor" in the Mirror Loan Note.

Committee takes this as supporting its conclusion that the term "trade creditor" in the grocery industry means "creditors that provide merchandise for resale." (Doc. # 1716, pp. 12-13.) This is a stretch. In identifying trade in the context of preparing advertising, Rivera necessarily would identify those providers of goods or services that ultimately are sold to consumers; that is the point of advertising for a supermarket. Thus, I do not take Rivera's testimony as supporting the Plan Proponent's position that the term "trade creditor" is widely-understood in the grocery industry to mean creditors that provide merchandise to stores for resale.

Quite the opposite, actually. As defined by Black's Law Dictionary, a vendor is a merely "a seller of goods and services," and a supplier is a subset of the group "vendor." Black's Law Dictionary 1555 (6th ed. 1990) (also defining vendor as "[a] merchant, retail dealer, supplier, importer, wholesale distributor"). Supplier is defined as "[a]ny person engaged in the business of making a consumer product directly or indirectly available to consumers" including "all persons in the chain of production and distribution of a consumer product." Id. at 1439. Thus, suppliers are sellers of a particular type of goods and services. Similarly, trade creditors are best described as a subset of the group "vendor." Trade creditors are sellers of goods and services at a particular time -- that is, in the ordinary

course of business.  Thus, a trade creditor is different from a
supplier.  In fact, it seems that Debtors' trade usage definition
of "trade creditor" is actually the standard definition of
"supplier."[10]

        The Plan Proponents have not offered evidence sufficient
to demonstrate that the parties to the Mirror Loan Note, at the
time of its execution, had a clear understanding that the term
"trade creditors" meant providers of grocery and other merchandise
for resale.  The Plan Proponents' own testimony as to their thought
processes and concerns during the execution of the Mirror Loan Note
contradict their stance that the contracting parties meant "trade
creditors" to cover solely providers of merchandise for resale.
And the Plan Proponents took no action to inform parties that may
not have known of the industry meaning of "trade creditor" about
that meaning.  Nor have the Plan Proponents convinced me that their
proffered trade usage definition of "trade creditor" is widely used

---

        [10]Indeed, Debtors contend that "Keon's testimony is further
bolstered by Puerto Rico law," citing "Law 75, 10 P.R. Laws § § 278-
278d, which "severely restricts distribution rights in Puerto Rico for
suppliers of good."  (Doc. # 1715, p. 20, n. 24 (emphasis added).)
Debtors argue that "[c]ertain of Pueblo Trade Claims were claims of
creditors protected by Law 75, and such creditors were truly
irreplaceable.  This law helped drive the negotiation of the
subordination provision of the Mirror Loan Note." (Id. (emphasis
added).)  As with Keon's declaration, Debtors do not contend that the
providers of grocery and other merchandise for resale were the sole
concern or sole purpose for the term "trade creditor."  If they had
been, based on Law 75 and the definition of "supplier," it would have
made most sense to use the word "supplier" instead of "trade
creditor."  Rather than bolster Keon's testimony, this argument
further demonstrates that Debtors had a more expansive definition of
"trade creditor" in mind when they executed the Mirror Loan Note.

in the grocery industry.[11]   Rather, I think the term "trade
creditor" assumed its commonplace, unambiguous meaning as
established by New York and other case law.   Accordingly, the
definition of Pueblo Trade Claim in the Plan altered the definition
of "trade creditor" as intended by the parties to the Mirror Loan
Note, likely to the surprise of many trade creditors.[12]

Evaluation of Settlements

          Settlements and "[c]ompromises are a normal part of the
process of reorganization."   Protective Comm. for Indep.
Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414,
424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 380 U.S. 106,
130 (1939)) (internal quotations omitted).   11 U.S.C. §
1123(b)(3)(A) states that a plan may provide for "the settlement or
adjustment of any claim or interest belonging to the debtor or to
the estate."   Reflecting their potentially integral role in the
process of reorganization, settlements and compromises often are
endorsed by courts.   See In re Coram Healthcare Corp., 315 B.R.
321, 329 (Bankr. D. Del. 2004) ("Compromises are generally favored
in bankruptcy."); Myers v. Martin, 91 F.3d 389, 393 (3d Cir. 1996)

---

[11]Absent Keon's testimony, the Plan Proponents have offered me no
evidence that their proffered trade usage of "trade creditor" is the
grocery industry usage.

[12]The fact that a creditor -- Empresa -- sought leave of the Court
to join in the objections of other parties after the objection
deadline had passed, arguing that it did not discover that its claim
was classified not as a Pueblo Trade Claim until after the deadline,
speaks to the alteration of the definition of "trade creditor."   Doc.
# 1733.

(quoting 9 <u>Collier on Bankruptcy</u> ¶ 9019.03[1] (15th ed. 1993) for the proposition that "compromises are favored in bankruptcy").  As noted by Debtors, the standards for approving settlements as part of a plan of reorganization are the same as the standards for approving settlements under Fed. R. Bankr. P. 9109.  <u>See</u> <u>In re New Century TRS Holdings</u>, 390 B.R. at 167 (using factors relating to Rule 9019 settlements to determine whether to approve a settlement contained in a plan of liquidation).

Although settlements are favored, "the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."  <u>In re Nutraquest</u>, 434 F.3d 639, 644 (3d. Cir. 2006).  When evaluating a settlement provided for under a plan of reorganization, "the Bankruptcy Court [must] determine that a proposed compromise forming part of a reorganization plan is fair and equitable."  <u>In re Exide Techs.</u>, 303 B.R. 48, 67 (Bankr. D. Del. 2003) (quoting <u>In re Cellular Info. Sys., Inc.</u>, 171 B.R. 926, 947-48 (Bankr. S.D.N.Y. 1994) (quoting <u>TMT Trailer</u>, 390 U.S. at 424)).  To determine whether a settlement is fair and equitable, Third Circuit courts consider four factors: "(1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it, and (4) the paramount interest of the creditors."  <u>In re New Century TRS Holdings</u>, 390 B.R. at 167; <u>see also</u> <u>In re</u>

Nutraquest, 434 F.3d at 645) (tracing the origin of these four factors). Additionally, though Third Circuit courts have laid out these four factors, Third Circuit courts have made clear that "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise" should be considered as well. In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting TMT Trailer, 390 U.S. at 424); see also In re Louise's Inc., 211 B.R. 798, 801 (D. Del. 1997) (noting that the court must determine whether a "compromise is fair, reasonable, and in the interest of the estate"). Of particular relevance to the instant proposed settlement, the Third Circuit in In re Nutraquest has stated: "Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, i.e., the parties who did not settle." In re Nutraquest, 434 F.3d at 645.

Ultimately, approval of a settlement is at the court's discretion. See In re Sea Containers Ltd., 2008 Bankr. LEXIS 2363, at *15 (Bankr. D. Del. Sept. 19, 2008). In considering a proposed settlement, the court's duty is to determine whether the compromise is reasonable, not whether the compromise is the best possible settlement: "[T]he court must assess whether [a settlement] is fair and equitable, but need not be convinced that the settlement is the best possible compromise. The court need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of

reasonableness." <u>Id.</u> (citing and quoting <u>In re Coram</u>, 315 B.R. at
330) (internal quotations omitted) (internal citations omitted);
<u>see also</u> <u>In re Integrated Health Services, Inc.</u>, 2001 Bankr. LEXIS
100, at *7 (Bankr. D. Del. Jan. 3, 2001) ("The responsibility of
the bankruptcy judge . . . is not to decide the numerous questions
of law and fact raised . . . but rather to canvass the issues and
see whether the settlement fall[s] below the lowest point in the
range of reasonableness." (quoting <u>Cosoff v. Rodman</u>, 699 F.2d 599,
208 (2d Cir. 1983)) (internal quotations omitted)).

<u>Definition Of Pueblo Trade Claim As An Element of This Settlement</u>

        Despite some creditors' contention to the contrary —
most ardently ASM  -- it is clear that the definition of Pueblo
Trade Claim, and, concomitantly, the definition of trade creditor,
is a settlement for the purposes of Rule 9019.  The Plan
Proponents, in briefs and in testimony, repeatedly assert that the
definition of "Pueblo Trade Claim" was the product of extensive
negotiations.  The Mirror Loan Note does not contain a definition
of trade creditor, nor is a definition evident in NSC's SEC filings
or in Debtors' schedules of assets or liabilities.  Rather, a
lengthy and tailored definition of Pueblo Trade Claim that impacts
which creditors are considered "trade creditors" is contained in
the first instance in the Plan, which itself is very complex and

lengthy.[13]  It is only logical to conclude that the definition of
Pueblo Trade Claim first arose sometime during the period in which
the Plan was initially created and then was refined as part of a
Plan that Debtors hoped would be accepted by the requisite number
of voting parties.  Hence, it is a settlement.  Moreover, that
definition alters the commonplace meaning of "trade creditor."
Though alteration of the meaning of a term is not necessary to
constitute a compromise or settlement,[14] this alteration clearly
makes the definition a part of a  settlement giving rise to the
Plan.

---

[13]ASM points to the structure of the definition of Pueblo Trade
Claim to support its argument that the term "trade creditor" assumed
its broader, commonplace in the Mirror Loan Note:
> Significantly, th[e] definition begins with "the Allowed
> Claims of <u>trade creditors who provided</u>" and then continues
> to whittle down "trade creditors" to a limited subset of
> "trade creditors" who provided services and goods that
> directly relate to merchandise sold by the Debtors. . . .
> Thus, the fact that the definition of Pueblo Trade Claim
> necessarily had to redefine "trade creditor" signifies it is
> not consistent with the Mirror Loan Note.
(Doc. # 1727, p. 11 (emphasis in original).)  I think this long and
complex, perhaps even "tortured" (as ASM writes), definition speaks
more to the fact that the definition of Pueblo Trade Claim is a
settlement for purposes of Rule 9019.

[14]Debtors also note that Rule 9019 settlements do not necessarily
need to be "the product of back and forth negotiations."  (Doc. #
1749, p. 15.)  I agree.  In some instances, a compromise or settlement
may arise by a proposal coming from one party that is immediately
accepted by the other parties without back and forth negotiations.  It
is immaterial which party proposed the change, what the underlying
reasons for that proposal were, or whether the proposal was
immediately accepted or whether it was discussed at length during
negotiations.  Rather, what is key is whether the change is "fair and
equitable" under the articulated standards of Rule 9019.

Indeed, even though ASM asserts that the "definition never was negotiated or settled . . . . It was manufactured," ASM's arguments in support of that assertion actually presume that the definition was a product of negotiation, and, thus, a compromise or settlement. (Doc. # 1727, p. 16.)  Directly before its assertion, ASM writes:  "If the Debtors' intent was clear at the time of the 2003 negotiations . . ., there would be no need or ability for the Plan Proponents to <u>negotiate</u> the definition." (<u>Id.</u> (emphasis added).)  A few sentences later, ASM contends that "the definition was <u>created</u> to unfairly redistribute value away from creditors who were rightfully entitled to it in an attempt to forge consensus for the Plan among the major constituencies in this case." (<u>Id.</u> (emphasis added).)  Thus, as even the objecting parties note, and as Keon stated in his declaration, Debtors representatives, the Committee, and others negotiated the definition of Pueblo Trade Claim, and with it, the definition of trade creditor.

Of the four factors courts have laid out to determine whether a settlement is fair and reasonable, three are relevant in the evaluation of the settlement constituted in the definition of Pueblo Trade Claim: (1) the probability of success in litigation; (2) the complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending it; and (3) the paramount interest of creditors.  As noted by the Plan Proponents,

the first two factors -- the probability of success in litigation and the complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending it -- are closely intertwined.  Both these factors marginally weigh in favor of approval of the settlement and of the Plan.

The Plan, which actually is three separate, linked plans, is highly complex and impacts numerous classes of creditors, including inter-company claims of some creditors.  If claims of certain creditors of Pueblo were reclassified from Pueblo General Unsecured Claims to Pueblo Trade Claims, the recovery amounts for other certain classes throughout the three separate plans would be affected.  As such, those creditors whose recovery amounts may be adversely impacted likely would contest their revised recoveries, perhaps leading to litigation.  Steven Simms, senior managing director of FTI Consulting, Inc. (a large restructuring advisory firm) and financial advisor to the Committee, testified that absent a settlement, "there would have been protracted litigation to first discovery to understand the details behind a lot of the inter-creditor issues, as well as discovery related to the claims levels and validity of the claims . . . . And I sense it would have taken an extensive amount of time and money."  (Doc. # 1700, 113:13:25, 114: 1-2.)

Moreover, as testified to by Simms, the Plan incorporates settlements of a variety of other issues; thus, if one part of that

settlement was not to be approved, every other piece of the entire settlement had the potential to be subject to dispute. Accordingly, the probability of success in the litigation and the complexity, expense, and delay necessarily attending it weigh in favor of approving the settlement.  However, that being said, as noted above, Debtors estimate that they will have approximately $60,800,000 to distribute to creditors.  Even if the litigation were to cost several million dollars, that would not have a significant impact on the amount to be distributed under a plan. I also find that none of the Plan Proponents' witnesses effectively articulated what facts and legal issues would be the subject of any such litigation.

But there is another reason why I will not approve the settlement or the Plan.  The compromise that is the definition of Pueblo Trade Claim severely adversely impacts "non-goods" trade creditors who were not at the negotiating table and who were not adequately represented in their absence.  The definition of Pueblo Trade Claim was the product of negotiations by and among: (1) the Senior Secured Notes Indenture Trustee, (2) two holders of Senior Secured Notes,(3) three trade creditors, (4) the PBGC, (5) the largest holder of the Senior Secured Notes, and (6) Debtors.  The three trade creditors were all "goods" trade creditors. Obviously, the Indenture Trustee, the three Senior Secured Note holders, and the PBGC could not qualify for Class 4A by any reasonable

definition of "trade creditor."  There were no "non-goods" trade creditors privy to the negotiations.

Further, the parties negotiating were heavily balanced in favor of the Senior Secured Note holders and the three "goods" trade creditors.  The Senior Secured Note holders are in Class 2B, which is directly subordinated to the "trade creditors."  Their anticipated recovery is 36.2%; this recovery percentage necessarily increased as the definition of "trade creditor" narrowed.  Hence, six of the nine negotiating parties arrived at a definition that disfavors the "non-goods" trade creditors and favors each of those six members.

Also, it is noteworthy that the negotiations included the largest holder of Senior Secured Notes.  Thus, the negotiators included four representatives of the Senior Secured Notes holders.  Keon noted on cross-examination that enlarging the Plan definition of "trade creditor" would result in a smaller distribution to the Senior Secured Notes holders.  See Doc. # 1700, 51:19-24.  These four negotiators -- which, when removing Debtors, constituted half of the negotiators -- obviously had a motive in arriving at a narrow definition of "trade creditor."

The Plan Proponents contend that Debtors and the Committee were available to protect the interests of the "non-goods" trade creditors.  However, I do not believe that Debtors were in a position to adequately represent and protect the

interests of "non-goods" trade creditors.  As to Debtors, Keon (the
CEO) and Daniel J. O'Leary (the CFO), who negotiated on Debtors'
behalf, would have received increased recovery if the definition of
Pueblo Trade Claim was expanded because they were creditors of
FLBN.  Doc. # 1715, p. 30.  Though this increased recovery aligned
their interests with the interests of "non-goods" trade creditors,
I do not think that it was sufficient to compel Keon and O'Leary to
negotiate with the same forcefulness and concerns as "non-goods"
trade creditors would have if they had been privy to the
negotiations.  As agents of Debtors, Keon and O'Leary were
motivated to create a plan that would receive the requisite
percentage of votes.  Accordingly, Keon and O'Leary would be more
apt to devalue their increased recovery in order to create a plan,
and, thus, cannot be considered to be protecting the "non-goods"
trade creditors by way of their interests.

          As to the Committee, it is true that an official
committee of unsecured creditors holds a fiduciary duty to the
committee's constituents, which, in this instance, includes "non-
goods" trade creditors.  See, e.g. In re Life Service Sys. Inc.,
279 B.R. 504, 513 (Bankr. W.D. Pa. 2002).  And, in general, even if
a creditor or a group of creditors does not hold a seat on the
committee, "adequate representation exists through a single
committee so long as the diverse interests of the various creditor
groups are represented on and have participated in that committee."

In re Sharon Steel Corp., 100 B.R. 767, 777-78 (Bankr. W.D. Pa. 1989).  However, as described in detail above, the composition of the Committee was such that the vast majority of the creditors on that Committee held interests aligned against the "non-goods" trade creditors.  Adequate representation of the "non-goods" trade creditors was wholly lacking and the fact that the Committee held a fiduciary duty does not make up for the lack of a cross-section of Debtors' creditors.  Indeed, in arguing that the Committee met its fiduciary duty, Debtors cite In re Garden Ridge Corp., 2005 WL 52312 (Bankr. D. Del. Mar. 2, 2005) for the proposition that "adequate representation is only lacking when conflicts between creditors prevent a committee from fulfilling its fiduciary obligations to all general unsecured creditors."  Doc. # 1715, p. 29.  A version of this problem is what likely happened in this instance: because the interests of all the trade creditors on the Committee were aligned, the interests of the "non-goods" trade creditors apparently were never voiced.  The Plan Proponent's fiduciary duty argument is not persuasive.[15]

_____

[15]In further support of their contention that the Committee represented the interests of the "non-goods" trade creditors, the Plan Proponents also note that in August 2007, a "non-goods" trade creditor, requested that it be appointed Nazca S&S to the Committee. The Plan Proponents then note that Nazca S&S did not further contact Debtors and made no other effort to participate in the Plan process. Nazca S&S should not be punished for not following up with Debtors repeatedly; one notification should have been sufficient to prompt Debtors to evaluate the composition of the Committee and adjust to make it more balanced.  Moreover, I do not think that any "non-goods" trade creditor was required to contact Debtors and request representation on the Committee.  Debtors should have taken the

Thus, none of the parties negotiating the definition of "Pueblo Trade Claim" had adequate reason to protect the interests of the "non-goods" trade creditors.  That the accepted settlement decreases the recovery of those trade creditors deemed to be "non-goods" instead of "goods" from 100% to 13.2% demonstrates the severity of the impact on the "non-goods" trade creditors.  I cannot hold that a settlement was fair and equitable under Rule 9019 when those parties whose rights were severely adversely impacted were not afforded meaningful participation in the negotiations.

Other courts have highlighted the preeminent interests of creditors, noting that the court's duty to protect their interests should only be set aside in certain circumstances.  Compare In re Nutraquest, 434 F.3d at 647 (noting that "insignificant disadvantages" to the only objecting creditor was not enough to outweigh the benefits to the estate and affirming approval of a settlement) and In re Marvel, 222 B.R. at 250 (considering whether a settlement was in the best interests of the creditors and concluding that because a substantial loss to some unsecured creditors was "very speculative," the court could approve the settlement), with In re Covington Props., Inc., 255 B.R. 77, 79-80

initiative to assess the composition of the Committee on its own.  In any event, I suspect that when the Committee was formed back in August 2007, none of the parties in interest were contemplating "trade creditors" as being limited to Pueblo Trade Claims.  The record clearly shows that this became a concept developed in the negotiations in the July 2008 time frame leading up to filing of the Plan.

(Bankr. N.D. Fla. 200) (holding that a settlement was not fair and equitable because it insulated insiders from litigation outside of the bankruptcy context by cutting off claims held by certain creditors) and In re Mavrode, 205 B.R. 716, 721 (Bankr. D. N.J. 1997) ("It is the duty of the bankruptcy court to ensure that the proposed settlement will not result in further injury to the other creditors. A proposed settlement will necessarily fail where one creditor benefits at the other creditors' expense."). In this instance, the loss to "non-goods" trade creditors is not speculative and is greatly disadvantageous: under the negotiated definition of "Pueblo Trade Claim," certain trade creditors' recovery decreases from 100% to 13.2%.

Moreover, courts are to "look to the fairness of the settlement to other persons, i.e., the parties who did not settle." In re Nutraquest, 434 F.3d at 645. Unlike in the two cases cited by the Plan Proponents -- In re Coram Healthcare Corp., 315 B.R. 321(Bankr. D. Del. 2004) and In re New Century TRS Holdings, Inc., 390 B.R. 140 (Bankr. D. Del. 2008) -- the "non-goods" trade creditors were not privy to the negotiations that defined "Pueblo Trade Claim," nor were any of the negotiators motivated to take the "non-goods" trade creditors' position into consideration. Thus, not only does this Court need to afford paramount consideration to the interests of creditors, but that consideration should focus

particularly on the fairness of a settlement to those parties who did not partake in the settlement.

The Plan Proponents argue that "the creditors voiced their opinion when they voted," thereby contending that the Court should take the decision of the impaired classes of creditors to approve the Plan as a demonstration of their decision to approve the settlement as well. Doc. #1716, p. 17.  Courts do give some deference to the acceptance of plans by voting creditors. See In re New Century TRS Holdings, 390 B.R. at 169 (in approving a settlement, taking into account that "the Plan is supported broadly by a diverse creditor body"); In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999) (noting that one of the factors "to consider in allowing a release of a third party as part of a plan of reorganization" is "if the impacted class or classes 'overwhelmingly' votes to accept the plan"); In re Turner Engineering, Inc., 109 B.R. 956, 960-61 (Bankr. D. Mont. 1989) (noting that in deciding between two competing plans, the "creditor's preference should be looked to in deciding which plan to confirm").   In this instance, I do not believe that the creditors' votes for the Plan reflect an affirmative decision as to the settlement contained in the definition of Pueblo Trade Claim. Including the late addition of Empresas, eight "non-goods" trade creditors are objecting to the Plan due to the definition of Pueblo Trade Claim; however, only one objecting creditor, ASM,

affirmatively voted against the Plan at the time of its proposal. That the other seven objecting creditors voted for the Plan and only later objected on grounds that, had they taken them into consideration then, seem to suggest that these creditors should have voted against the Plan, implies that deference to their votes as to the Plan is not warranted.  Indeed, in its motion to join in the objections, Empresas stated that it was not until after it voted on the Plan that it understood its position as a "non-goods" trade creditor.  Accordingly, I think that any necessary deference to the acceptance of the Plan by the voting creditors does not outweigh the fact that the settlement contained in the definition of Pueblo Trade Claim severely disadvantaged certain of those voting creditors.

In its opposition, ASM asserts that "[t]he distribution scheme in the Plan is somewhat convoluted."  (Doc. # 1727, p. 6. ) I agree and this fact is clearly reflected in the five-page explanation in Debtors' post-trial brief under the caption "Distributions Under the Plan."  (Doc. # 1715, pp. 7-10.)  The "non-goods" trade creditors who voted for the Plan without the assistance of bankruptcy counsel could very likely not have even understood how the negotiations produced an adverse result for them.

The settlement contained in the definition of Pueblo Trade Claim so affects the position of the "non-goods" trade

creditors that I must rule that it is not fair and equitable. Though the definition serves the interests of the Plan Proponents, it is not in the interests of the "non-goods" trade creditors. In fact, the definition is so against their interests that I believe any benefit it provides the bankruptcy estate is more than outweighed by the detriment it brings to the "non-goods" trade creditors who were not afforded meaningful participation in the negotiation of the definition and who I have a duty to ensure are not injured to the benefit of other creditors. Accordingly, I will not approve the settlement, and, thereby, I will not confirm the Plan.

One final note. The last portion of the Pueblo Trade Claim definition states that it includes "any other Allowed Claim otherwise designated by Debtors with the consent of the Committee or Steering Committee (which consent will not be unreasonably withheld or delayed) as a Pueblo Trade Claim." (Doc. # 1499, app. A, § I.B.1.132.) I question the propriety of that provision. It is not clear how that provision would be implemented. Who gets notice of such a decision and what opportunity is there for a court challenge to the decision? Absent such notice and opportunity to challenge, this provision comes very close to a simple statement that any other Allowed Claim is a Pueblo Trade Claim if Debtors and the Committee say it is.

## CONCLUSION

For the reasons stated herein, I will not confirm the Plan.

**EXHIBIT A**

Michael B. Solow
Harold D. Israel
Matthew J. Micheli
KAYE SCHOLER LLC
Three First National Plaza
70 West Madison Street
Suite 4100
Chicago, IL 60602

David B. Stratton
David Fournier
James C. Carignan
PEPPER HAMILTON LLP
1313 Market Street, Suite 5100
Wilmington, DE 19899

Counsel for Nutritional Sourcing Corporation, Pueblo
International, LLC and FLBN, LLC

Felicia Gerber Perlman
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
333 West Wacker Drive
Chicago, IL 60606

Mark S. Chehi
Kimberly A. LaMaina
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

Counsel for the Official Committee of Unsecured Creditors

Joseph H. Huston, Jr.
STEVENS & LEE, P.C.
1105 North Market Street
Suite 700
Wilmington, DE 19801

Steven E. Lewis
DUNNINGTON, BARTHOLOW &
MILLER LLP
1359 Broadway – 6th Floor
New York, NY 10018

Chester B. Salomon
STEVENS & LEE, P.C.
485 Madison Avenue, 20th Floor
New York, NY 10022

Counsel for Badillo Nazca S&S, Inc. as successor in interest to
Badillo Nazca S&S Co.

Donna L. Harris
PINCKNEY, HARRIS & WEIDINGER, LLC
1220 N. Market Stret, Suite 950
Wilmington, DE 19801

Counsel for Liquidity Solutions, Inc.

Adam G. Landis
Kerri K. Mumford
J. Landon Ellis
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
Wilmington, DE 19801

Counsel for ASM Capital LP & ASM Capital III LP

Marla R. Eskin                      Jon C. Vigano
Kenneth Dorsney                     Patricia J. Fokuo
CAMPBELL & LEVINE, LLC              SCHIFF HARDIN LLP
800 North King Street              6600 Sears Tower
Suite 300                          Chicago, IL 60606
Wilmington, DE 19801

Counsel for El Dia, Inc. and El Nuevo Dia, Inc.

Mark Minuti
Jeremy W. Ryan
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899

Counsel for Puerto Rico Electric Power Authority

Jami B. Nimeroff                    Barbra R. Parlin
BROWN STONE NIMEROFF LLC           Arthur E. Rosenberg
4 East 8th Street                   Peter A. Zisser
Suite 400                          HOLLAND & KNIGHT LLP
Wilmington, DE 19801               195 Broadway
                                   New York, NY 10007

Counsel for Rio Grande Investment, LLC and Plaza San Francisco
Investment, LLC

Eric Lopez Schnabel
Robert W. Mallard
DORSEY & WHITNEY (DELAWARE) LLP
1105 North Market Street (16th Floor)
Wilmington, DE 19801

Counsel for Empresas de Gas Co., Inc.